United States Court of Appeals,

Fifth Circuit.

No. 93-4434.

Creig MATTHEWS, et al., Plaintiffs,

Creig Matthews, Plaintiff-Appellant,

v.

Kim WOZENCRAFT, Random House, Inc., Ballantine Books, a Division of Random House, Inc., the Zanuck Company, and Metro-Goldwyn-Mayer Inc., f/k/a MGM/Pathe Communications Company, Defendants-Appellees.

March 3, 1994.

Appeal from the United States District Court for the Eastern District of Texas.

Before HENDERSON,[*] SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

## I.

## A.

Prior to 1979, Creig Matthews was an undercover narcotics officer with the Plano, Texas, police department, in charge of the criminal investigation division. Kim Wozencraft (Kim Ramsey at the time) was hired as a police officer. Matthews trained and then worked with her as an undercover narcotics officer making drug purchases. Both of them used drugs, primarily marijuana and cocaine, while on the Plano drug assignment.

In August 1978, Matthews was hired by the Tyler, Texas, police department as an undercover narcotics officer, where he used the aliases "Jim" and "Jim Myers." Early the next year, Wozencraft joined him in Tyler as an undercover drug officer. Together they conducted a drug investigation that lasted until April 24, 1979. During this time, they became romantically involved and began living together.

Their primary target in Tyler was Ken Bora, for whom Matthews worked undercover as a bartender. After several futile attempts to buy drugs from Bora, Matthews and Wozencraft, on

---

[*]Circuit Judge of the Eleventh Circuit, sitting by designation.

instruction from Tyler police chief Willie Hardy, made a phony "stash" case on Bora.

During the investigation, Matthews and Wozencraft used drugs both to make drug cases and for personal use, eventually becoming addicted. They informed Hardy of Matthews's drug problem. He gave them several days off but insisted that they continue with the investigation. At the end of the Tyler investigation, Matthews and Wozencraft assembled over 200 drug cases, involving the arrest of 100 defendants.

At the conclusion of the investigation, Matthews and Wozencraft were attacked by a shotgun-wielding assailant at Wozencraft's mobile home. She returned fire and was not seriously hurt; Matthews was severely wounded in the arm and leg and was hospitalized for over a month. After being released from the hospital, Hardy placed them in a house on the outskirts of Tyler. While there, they were visited by H. Ross Perot, who at the time was serving as chairman of a special crime commission. Perot moved them to a secure safe-house in the Dallas area and arranged for Matthews to receive medical treatment for his wounds.

During this time, Matthews and Wozencraft began testifying at the trials of some of the drug defendants. They falsely denied using drugs during the investigation and falsely testified that they had bought cocaine from Bora.

Evidence arose of their misconduct. Eventually they confessed, pleaded guilty to criminal informations alleging civil rights violations, and were sentenced to terms in federal prison.

B.

While in prison, Wozencraft, Matthews, and fellow inmate John Rubien signed the contract at issue in this case (the "Prison Agreement"). Matthews and Wozencraft were married at the time the contract was formed, and Wozencraft is identified in it as "Kimberly Ramsey Matthews." The contract specifies that Wozencraft and Rubien were to co-author a book based upon Matthews and Wozencraft's story about the undercover investigations.

Wozencraft was released from prison in the spring of 1983. She divorced Matthews and moved to New York City to join Rubien. She already had started writing the book. She described events in the book, linking them to specific events that had transpired during the investigations. The

co-authored book by Wozencraft and Rubien was not finished during the one-year period provided for by the Prison Agreement.

Wozencraft received a masters degree from Columbia University. Her thesis became the basis for the book entitled RUSH. She sold her manuscript to Random House and sold the movie rights for one million dollars.

There is substantial evidence that the character "Jim Raynor" in RUSH is based upon Matthews and that the public recognized him as that character.[1] Nonetheless, the book is labeled as a novel and states on its copyright page that it "is a work of fiction. Any resemblance its characters may have to persons living or dead is purely coincidental."

Matthews concedes that the issue raised in RUSH, i.e., corruption of law enforcement officers, is a matter of public concern. His willingness to discuss the book with the media has made him a public figure. Furthermore, prior to the publication of RUSH, Matthews cooperated with an author named David Ellsworth in publishing SMITH COUNTY JUSTICE, a non-fiction book detailing Matthews's life and the events surrounding the Tyler operation.

Matthews has received no compensation for the defendants' use, portrayal, or promotion of his likeness in the book and movie.

## II.

### A.

Matthews filed a diversity suit alleging breach of contract, division of marital asset, and misappropriation/invasion of privacy against Wozencraft and misappropriation and invasion of privacy against Random House, Zanuck, and MGM. The defendants filed motions for summary judgment, which the district court granted.

### B.

We review a grant of summary judgment *de novo*. *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). Summary judgment is appropriate "if the pleadings,

---

[1]For purposes of reviewing the district court's grant of summary judgment, we will assume that the Raynor character indeed is based upon Matthews.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Hanks,* 953 F.2d at 997.

We begin our determination by consulting the applicable substantive law to determine what facts and issues are material. *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). We then review the evidence relating to those issues, viewing the facts and inferences in the light most favorable to the non-movant. *Id.* If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554-2555.

## C.

The district court granted summary judgment on Matthews's appropriation claim because Texas law does not recognize a cause of action for appropriation of one's life story and because if it did, there would be an exception for biographies and "fictionalized biographies." We affirm the summary judgment.

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." RESTATEMENT (SECOND) OF TORTS (the "RESTATEMENT") § 652C (1977). *See also Kimbrough v. Coca-Cola/USA,* 521 S.W.2d 719, 722 (Tex.Civ.App.—Eastland 1975, writ ref'd n.r.e.). There are three elements to a misappropriation claim under Texas law: (i) that the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (ii) that the plaintiff can be identified from the publication; and (iii) that there was some advantage or benefit to the defendant. *See* J. HADLEY EDGAR & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 53.06[2]; *Faloona v. Hustler Magazine,* 799 F.2d 1000 (5th Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). Under this test, Matthews is unable to create any issue of material fact

as to liability.

There is no question that Matthews can be identified from the publication, at least to the point of creating a genuine issue of fact as to the identity of the Jim Raynor character. He claims that his life story was appropriated for Wozencraft's commercial benefit. The protection of "name or likeness" under Texas law, however, does not include a person's life story. If Texas law did protect such a right, it was not "appropriated." And, even if Matthews could state a claim, Wozencraft would be protected by an exception in the state tort law.

Tortious liability for appropriation of a name or likeness is intended to protect the value of an individual's notoriety or skill. Thus, the RESTATEMENT notes, "In order that there may be liability under the rule stated in this Section, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness." RESTATEMENT § 652C, comment c. The misappropriation tort does not protect one's name *per se;* rather, it protects the value associated with that name.

Appropriation of a name or likeness generally becomes actionable when used "to advertise the defendant's business or product, or for some similar commercial purpose." RESTATEMENT § 652C, comment b. The value of one's likeness is not "appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity.... It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded." RESTATEMENT § 652C, comment d.

There is nothing unique about Matthew's name or likeness that creates value for Wozencraft to appropriate. She is not "cashing-in" on goodwill associated with his name but is simply converting factual events that happen to include Matthews into fiction. The use of his name does not provide value to the book, nor is she using his name to "endorse" the book to the public, because his name has no independent value. In short, Matthew's life story, while interesting to readers and film-goers, is not a "name or likeness" for purposes of applying the misappropriation doctrine.

Protecting one's name or likeness from misappropriation is socially beneficial because it

encourages people to develop special skills, which then can be used for commercial advantage. Associating one's goodwill with a product transmits valuable information to consumers. Without the artificial scarcity created by the protection of one's likeness, that likeness would be exploited commercially until the marginal value of its use is zero.[2]

For instance, if a well-known public figure's picture could be used freely to endorse commercial products, the value of his likeness would disappear. Creating artificial scarcity preserves the value to him, to advertisers who contract for the use of his likeness, and in the end, to consumers, who receive information from the knowledge that he is being paid to endorse the product.[3] *See Kimbrough,* 521 S.W.2d at 722 (in which former Texas A & M football star stated valid claim for misappropriation where his picture was used, over his objection, as part of an advertisement for Coca-Cola in a football game program).

As Judge Posner writes,

> It might seem that creating a property right in such uses would not lead to any socially worthwhile investment but would simply enrich already wealthy celebrities. However, whatever information value a celebrity's endorsement has to consumers will be lost if every advertiser can use the celebrity's name and picture.... [T]he value of associating the celebrity's name with a particular product will be diminished if others are permitted to use the name in association with their products.

RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 3.3, at 43 (4th ed. 1992). The tort of misappropriation of name or likeness, therefore, creates property rights only where the failure to do

---

[2]If the appropriation of an individual's goodwill were left untrammelled, it soon would be overused, as each user will not consider the externality effect his use will have on others. Each use of the celebrity's name or face will reduce the value that other users can derive from it. The use of a name or face, therefore, is analogous to the overuse of a public highway: In deciding whether to use the road, each user does not consider the increased congestion that his use will inflict on others. *See* Frank H. Knight, *Some Fallacies in the Interpretation of Social Cost,* 38 Q.J. ECON. 582 (1924).

We can ration the use of highways by imposing tolls. *See id.* We grant celebrities a property right to ration the use of their names in order to maximize their value over time.

[3]The information transmitted is both direct and indirect in nature. It is direct because of any goodwill (or ill-will) associated with the person's link to the product. Indirect information is transmitted because the payment by the advertiser to him is an investment in nonsalvageable capital signaling a commitment to quality by the advertiser. *See* Benjamin Klein & Keith B. Leffler, *The Role of Market Forces in Assuring Contractual Performance,* 89 J.POL.ECON. 615, 630-31 (1981).

so would result in the excessive exploitation of its value.[4]

Thus, the term "likeness" includes such things as pictures, *National Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533 (W.D.Tex.1980), drawings; *Benavidez v. Anheuser Busch, Inc.,* 873 F.2d 102 (5th Cir.1989); and the use of a singer's distinctive voice, *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093 (9th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993) (reasoning that "a voice is as distinctive as a face" and thus cannot be imitated in order to sell a product), that one could exploit for commercial advantage. If exploitation of this beneficial information were not limited, its value soon would be dissipated.

The term "likeness" does not include general incidents from a person's life, especially when fictionalized.[5] The narrative of an individual's life, standing alone, lacks the value of a name or likeness that the misappropriation tort protects. Unlike the goodwill associated with one's name or likeness, the facts of an individual's life possess no intrinsic value that will deteriorate with repeated use. As Posner observes, "If Brand X beer makes money using Celebrity A's picture in its advertising, competing brands might use the same picture until the picture ceased to have any advertising value at all. In contrast, the multiple use of a celebrity's photograph by competing newspapers is unlikely to reduce the value of the photograph to the newspaper-reading public." RICHARD A. POSNER, THE ECONOMICS OF JUSTICE 258 (2d ed. 1983).

Far from reducing the value of Matthews's story, RUSH increased the value, as reflected in the publication of articles about Matthews and Wozencraft in NEW YORK MAGAZINE, THE WASHINGTON POST, and THE GUARDIAN, among others. Similarly, SMITH COUNTY JUSTICE, although

---

[4]The social goals misappropriation furthers are identical to those animating the prohibition of fraud. *See, e.g., Moore v. Big Picture Co.,* 828 F.2d 270, 277 (5th Cir.1987) (misappropriation occurs when plaintiff's name used by defendant without permission in order to secure a contract); *see also POSNER, supra,* § 4.6, at 109-10 (fraud reduces societal wealth by encouraging investment in wealth-redistributing, rather than wealth-creating, activity).

[5]*See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 117 at 853 (5th ed. 1984) ("Nor is there any liability [for misappropriation] when the plaintiff's character, occupation and the general outline of his career, with many incidents in his life, are used as the basis for a figure in a novel who is still clearly a fictional one."); *Hampton v. Guare,* 600 N.Y.S.2d 57, 58 (App.Div.1993); *Toscani v. Hersey,* 271 A.D. 445, 65 N.Y.S.2d 814, 817-18 (1946).

published first, did not reduce the sales of RUSH. As there is no fear that any valuable information provided by the facts of one's life will be reduced by repeated use, the law does not forbid the "appropriation" of this information.

Further, because most of the material facts are a matter of public record because of the highly-publicized trial, it is especially difficult for Matthews to claim that his likeness was unfairly appropriated, as a name cannot be appropriated by reference to it in connection with the legitimate mention of public activities. *See Melvin v. Reid,* 112 Cal.App. 285, 297 P. 91, 93 (1931). "No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation." RESTATEMENT § 652C, comment d.

## III.

### A.

Even if Texas courts recognized a cause of action for misappropriation of events in one's life, it likely would recognize an exception for biographies. As one commentator has written, "Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. Only the use of an individual's identity in advertising infringes on the persona." George M. Armstrong, Jr., *The Reification of Celebrity: Persona as Property,* 51 LA.L.REV. 443, 467 (1991) (citing *Rogers v. Grimaldi,* 695 F.Supp. 112, 121 (S.D.N.Y.1988), *aff'd,* 875 F.2d 994 (2d Cir.1989)); *see also Frosch v. Grosset & Dunlap, Inc.,* 75 A.D.2d 768, 427 N.Y.S.2d 828, 829 (1980).

### B.

Matthews also contends that appropriation can occur through the fictionalized account of his life. *See Benavidez v. Anheuser Busch, Inc.,* 873 F.2d 102, 104 (5th Cir.1989). The cases he cites, however, do not support his argument, as they apply the "false light" doctrine. In each of them, (1) the plaintiff's real name was used; (2) false or defamatory statements were made regarding the plaintiff; and (3) the plaintiff alleged invasion of privacy by false light, not misappropriation.

By contrast, RUSH does not use Matthews's real name, and Matthews admits that all the material facts are true. Thus, assuming he is trying to state a claim under the false light doctrine, rather than misappropriation, his attempt fails.[6]

C.

Even if Matthews has created a genuine issue of material fact on his misappropriation claim, Wozencraft is entitled to summary judgment as a matter of law because of free speech and public domain defenses. Even though the district court did not base its holding upon these grounds, they can still serve as the basis for affirming. *See Degan v. Ford Motor Co.,* 869 F.2d 889, 892 (5th Cir.1989) (court may ignore any erroneous holding of the district court and affirm judgment on other grounds); *Church of Scientology v. Cazares,* 638 F.2d 1272 (5th Cir. Mar. 1981) (same).

1.

While there is no binding authority directly on point, we conclude that Wozencraft's novel falls within the protection of the First Amendment. It is immaterial whether RUSH "is viewed as an historical or a fictional work," *Meeropol v. Nizer,* 560 F.2d 1061, 1067 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), so long as it is not "simply a disguised commercial advertisement for the sale of goods or services." *Rogers v. Grimaldi,* 875 F.2d 994, 1004 (2d Cir.1989) (quoting *Frosch,* 427 N.Y.S.2d at 829). The book and its accompanying publicity have converted Matthews into a public figure under *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). "[T]he same standards of constitutional protection apply to an invasion of privacy as to libel actions." *Meeropol,* 560 F.2d at 1066.

Accordingly, absent a showing of malice, i.e., a "reckless disregard for the truth," RUSH is protected by the First Amendment. *See Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Neither the book nor the movie holds out Matthews in a false light or in an embarrassing way; thus, his claim is meritless.

RUSH is also protected by TEX. CONST. art. I, § 8. The Texas Constitution grants broader

---

[6]It is questionable whether the false light tort is even viable in Texas, and this court has certified that question to the Texas Supreme Court in *Cain v. Hearst Corp.,* 1 F.3d 345 (5th Cir.1993) (per curiam), *certification accepted* (Tex. Feb. 9, 1994) (No. D-4171).

protection to speech and press than does the United States Constitution. *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992). The court in *Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198 (Tex.1992), did not specifically address the scope of the appropriation tort, but it suggested that privacy torts should be construed narrowly. *See also id.* at 205 n. 4 (Gonzalez, J., concurring in part and dissenting in part) (noting that *Kimbrough* is the only Texas case recognizing the misappropriation tort). Given this hesitation to expand the scope of the various privacy torts, it is unlikely that Texas courts would extend the tort to create liability for the fictional portrayal of Matthews's personal life.

2.

Liability for misappropriation also will not arise when the information in question is in the public domain, for the public figure no longer has the right to control the dissemination of the information. *See Douglass v. Hustler Magazine,* 769 F.2d 1128, 1139 (7th Cir.1985), *cert. denied,* 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986); *Jenkins v. Dell Publishing Co.,* 251 F.2d 447, 451 (3d Cir.), *cert. denied,* 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958). "To whatever degree and whatever connection a man's life ceases to be private before the publication under consideration has been made, to that extent the protection is withdrawn...." Samuel D. Warren & Lewis D. Brandeis, *The Right to Privacy,* 4 HARV.L.REV. 193, 214-15 (1890). As one court has commented,

> [A] public figure has no exclusive rights to his or her own life story.... Such life story of the public figure may legitimately extend, to some reasonable degree, to ... information concerning the individual, and to facts about him, which are not public.... Thus the life history of one accused of [crime], together with such heretofore private facts may throw some light upon what kind of person he is, his possible guilt or innocence, or his reasons for committing a crime, are a matter of legitimate public interest.

*Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899, 919 (1971).

In the time since his participation in the Tyler drug investigation and his subsequent conviction and prison time for his illegal activity, Matthews voluntarily submitted to numerous interviews with the national media. He also cooperated in the publication of SMITH COUNTY JUSTICE and testified about his activities in Hardy's criminal trial. All the material facts underlying RUSH were a matter of public knowledge and were in the public domain.

Thus, Matthews became a public figure through his activities. The subject matter of his statements—narcotics officers using drugs, perjuring themselves, and making fraudulent charges—was a matter of public interest. *See Trotter v. Jack Anderson Enters.,* 818 F.2d 431, 434 (5th Cir.1987). Because all of the events were a part of the public domain, defendants were entitled to their fair use, including their narration in fictionalized form. *Douglass,* 769 F.2d at 1139.

## IV.

Matthews contends that the district court erred by granting summary judgment on his claim that Wozencraft breached the contract they signed in prison. The district court held that the contract expired by its own terms on June 1, 1984; that Matthews presented no evidence that any of the conditions justifying extensions of the contract were met; and that there were no terms and conditions in the contract providing for a continuing obligation between Matthews and Wozencraft after June 1, 1984.

Matthews argues that his ownership rights to the "story" and its sale proceeds were extinguished by the district court. He contends that the court mistakenly treated "the story," i.e., the events behind RUSH, as the same entity as the "co-authored book" itself. He argues that the Prison Agreement provides a one-year term for the co-authors to complete a book but that, if it was not completed in one year, he and Wozencraft were to share the proceeds generated by any future production of "the story."

In construing a contract, we ascertain and give effect to the real intentions of the parties, as that intention is revealed by the language used in the agreement. *Dedier v. Grossman,* 454 S.W.2d 231, 234-35 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.). The agreement is read in its entirety. *Greene v. Condor Petroleum Co.,* 140 S.W.2d 844, 848 (Tex.1940). All of its provisions are considered and construed together to ascertain the meaning and effect of the instrument. *Midland v. Waller,* 430 S.W.2d 473, 478 (Tex.1968).

Each clause or paragraph must be considered with reference to every other, so that the effect of one provision on the others may be determined. *Beaty v. Maritime Assn's-I.L.A. Pension, Welfare & Vacation Funds,* 442 S.W.2d 823, 825 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd).

This is the "four corners" rule: The entire instrument, taken by its four corners, must be read and considered to determine the true intentions of the parties. *Idalou Coop. Cotton Gin v. Gue,* 317 S.W.2d 240, 246 (Tex.Civ.App.—Dallas 1958, writ ref'd n.r.e.).

Matthews contends that he and Wozencraft were co-owners of the story in perpetuity and that they hoped to have a book about the story co-authored within a year. If the book was not written within a year, they were to share equally in any proceeds that might arise from a sale of the story. Matthews rests this argument on a portion of the agreement that states that they "are equal partners in all and every payment of money deriving from the sale of the "story' under the terms of this agreement." Thus, provisions concerning the co-authored book had a one-year deadline, but Matthews's ownership interest in the "story" and in proceeds from its sale is not terminated or forfeited by the contract's one-year term.

The district court held that the contract expired by its own terms on June 1, 1984, extinguishing Matthews's ownership and payment rights for the story. We agree. The concluding sentence of the Agreement states, "This contract shall commence upon June 1, 1983, and shall remain in force until June 1, 1984." The term "contract" must refer to all rights and obligations established among the parties, including Wozencraft and Matthews. Thus, after one year, all rights and duties among the parties expired.

If the co-authored book was not completed within one year, the contract provides that the "co-authors' work would remain their property," and "no compensation from any source [would] be due any party." If the book was not complete, Wozencraft and Matthews had the right to seek other arrangements for writing and publication of a book. Afterwards, the story became part of the public domain, denying Matthews compensation for Wozencraft's book.

Matthews argues that the one-year deadline, construed in context, refers only to the time in which the co-authors were to complete their book. That section is labeled "Publishing and Content," and most of the provisions within the section deal with the mechanism for publishing the prospective book, e.g., selecting an agent and publisher. Matthews contends that the one-year provision creates a deadline only for the portions of the contract dealing with the publication of the co-authored book

with Rubien. According to Matthews, the one-year time limit had no effect on any rights established by the contract with regard to the story.

But the provision says that the "contract" shall run for one year, implying that the entire agreement was valid for only one year. Furthermore, the preceding paragraph states, "No changes or amendments can be made in this agreement without the written approval of all three parties." This also seems to be a general provision applying to the contract as a whole. Finally, these elements are the last two paragraphs of the document, implying that they were intended to be "catch-all" provisions applying to the whole contract and just incidentally are located in the "Publishing and Content" section.

Furthermore, Matthews's construction of the agreement would be nonsensical. Under his interpretation, the agreement would grant Matthews a perpetual right to share equally in any proceeds resulting from the story. It is questionable that the parties would create a contract unlimited in term and even more unlikely that they would memorialize such a sweeping arrangement in an agreement as crude as the Prison Agreement. Finally, if Matthews intended the agreement to have such an unusual meaning, he should have made this evident. Instead, the alleged perpetual contract with Wozencraft regarding the story was bundled with the one-year book agreement with Wozencraft and Rubien.

Matthews's reading also presumably would have given Wozencraft a perpetual right in any production made from Matthews's cooperation with a third party. Given his collaboration with Ellsworth in publishing SMITH COUNTY JUSTICE, it is doubtful that he intended to bind himself to Wozencraft as the sole narrator of the story. Absent evidence that the one-year period identified in the contract did not apply to the entire document, his claim that the Prison Agreement created perpetual rights to share equally in the proceeds of the story is untenable.

The contract could be extended if certain requirements were met. For example, one provision states, "In the event of failure of completion, Benjamin Matthews has the right to grant the co-authors a period of continuation beyond 15 days, but has no legal obligation to do so." Matthews presented no evidence that he fulfilled those conditions. No terms and conditions of the "other arrangements"

were specified in the Prison Agreement, and no other arrangements were ever reached.

In summary, the Prison Agreement expired of its own terms on June 1, 1984, extinguishing Matthews's rights at that time. Matthews has not demonstrated that this reading is flawed or that he extended the contract beyond the one-year period.

## V.

Matthews claims that "his ownership rights in the story and proceeds from the sale of the story, evidenced by the contract were not divided in his divorce and, t herefore, should be divided under Texas law." *See* TEX.FAM.CODE § 3.90. The district court held that because Matthews had no right to the proceeds under the contract, there was no marital asset to distribute. Matthews contends that he had ownership rights that should have been distributed in the divorce.

Under Texas law, Matthews's claim is barred by *res judicata*. Once assets have been divided in a divorce decree, subsequent suits to divide property are barred. *Id.* § 3.71; *Law v. Law,* 792 S.W.2d 150, 152 (Tex.Civ.App.—Houston [1st Dist.] 1990, writ denied). Under TEXAS FAMILY CODE § 3.71, a court lacks power to "amend, modify, alter, or change the division of property made or approved in the decree of divorce."

The state court found that Matthews and Wozencraft did not accumulate any property during their marriage. Any personal property was awarded to the parties in possession. Whatever property Matthews now claims was community property, he knew of at the time the divorce decree was entered. Thus, his complaint about the division of marital property is barred by *res judicata.*

## VI.

Matthews has created no genuine issue of material fact under Texas law. Thus, we AFFIRM the district court's grant of summary judgment on all claims.