United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 5, 2003**

Charles R. Fulbruge III
Clerk

**REVISED JUNE 5, 2003**
**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 02-20924

_____

PATSY FINCH,

Plaintiff - Appellee,

versus

FORT BEND INDEPENDENT SCHOOL DISTRICT, et al.,

Defendants,

DON HOOPER, Individually and in his official capacity;
ARTHUR CULVER, Individually and in his official capacity,

Defendants - Appellants.

_____

Appeal from the United States District Court
For the Southern District of Texas

_____

Before SMITH, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Superintendents of a school district appeal the interlocutory order denying their motion for

summary judgment predicated on qualified immunity, where a former middle school principal sued

the superintendents and school district following her alleged constructive discharge. The former principal brought claims for: violation of her rights under the United States Constitution to freedom of speech and association and to procedural and substantive due process; violation of her rights under the Texas Constitution to freedom of speech and association; breach of contract; and intentional infliction of emotional distress. We REVERSE IN PART the order of the district court denying summary judgment as it pertained to all constitutional claims, and DISMISS the appeal as it pertains to the Texas tort law claim.

## I. FACTS AND PROCEEDINGS

Prior to the events at issue in this litigation, Patsy Finch ("Finch") worked for the Houston Independent School District for 27 years, including 6 years as a teacher, 2 years as an assistant principal, and 21 years as a secondary principal.

Arthur Culver ("Culver") actively recruited Finch for 2 years to join Fort Bend Independent School District ("FBISD"). Finch ultimately accepted Culver (and FBISD)'s offer, which included the position of principal at her choice of middle schools. Finch started as principal of Lake Olympia Middle School under a one-year probationary contract. *See* TEX. EDUC. CODE ANN. § 21.102(a) (1996). As Superintendent of Area I, Culver supervised Finch.

In the fall of the probationary year, Culver directed Finch to write a proposal for a "School Within a School" program to address issues that had been discussed at an Area I principals' meeting. The program involved placing students whose age exceeded the corresponding grade level by as much as three years in separate classrooms with an enriched curriculum. Finch presented her written proposal to Culver later that fall. No formal action was taken on the proposal that school year.

At the end of the probationary year, Culver evaluated Finch: "Overall, Mrs. Finch has done an

2

outstanding job. She has overcome many obstacles in order to make [Lake Olympia Middle School] a better place for teaching/learning to take place. There was a high turnover rate with teachers, however, that is normal when you bring in a strong instructional leader with high expectations & accountability. Change & turnover was needed." Finch received a two-year term contract.

In November of the first year under the term contract, Don Hooper ("Hooper"), Superintendent over all of FBISD (and Culver's direct supervisor), invited Finch to present her "School Within a School" proposal to the FBISD executive cabinet, which comprised Hooper, all area superintendents (including Culver), and all associate superintendents. The minutes from that meeting state:

> A considerable amount of time was spent for the presentation and dialogue about different aspects of the proposal. [The associate superintendent for budget and finance] suggested that Finch meet with someone from his staff to review her proposed budget, and [the then Area III superintendent] suggested [Finch] review a program at Hodges Bend Middle School that has a similar concept. In conclusion, Dr. Hooper commended Finch for her work and desire to address the needs of these children. He also asked that she review certain areas of the proposal and provide greater detail and descriptions of how the program will be different, and thus prove successful for these students.

Three months later, Finch's employment situation abruptly changed. On February 25, Culver informed Finch that Hooper wanted Finch to resign, effective at the end of the school year. Hooper suggested Finch would be reassigned if she did not resign. The request stunned Finch. She and Culver went to see Hooper. According to Finch's deposition, Hooper opened the conversation by stating: "I just don't like you, and I made a mistake in bringing you here from [Houston] ISD. We need to cut our losses, and you need to leave. You need to resign[.]" Hooper stated Finch was not keeping the parents of her students under control. Hooper expressed displeasure about contemporary media reports that a few years earlier, when Finch was principal of Pershing Middle School, the coach

3

of Pershing's female basketball team allegedly raped a member of the team during a school function. Hooper further expressed concern that Finch had defended Jackie Gilbert, a physical education teacher Finch had brought with her from Pershing, who had recently resigned following charges of impropriety. Hooper also told Finch that "he didn't like the School Within a School proposal, that he was absolutely sick of [it]."[1]

---

[1] Finch's deposition regarding the February 25, 1999, meeting reads:

Q. When Dr. Hooper came into the office, what happened?
A. He sat down in a chair.
Q. And what happened?
A. And he leaned over and put his hand on his head; and he said something to the effect about, "I just don't like you, and I made a mistake in bringing you here from HISD. We need to cut our losses, and you need to leave. You need to resign," something to that effect.
 . . .
Q. So on February 25, 1999 when Dr. Hooper met with you after saying that he just didn't like you and wanted to cut his losses, what was your response?
A. I started crying.
Q. Did you question him?
A. Of course.
 . . .
Q. And what was his response?
A. He told me that I was one of 50-some-odd principals in the district that couldn't control their parents . . . . He told me [about] the recent television story [regarding the alleged rape at Pershing] . . . and he said, "Any ripple out in the community could have an adverse effect on me." He didn't like that. And he told me I was strong but he had made a mistake in bringing me out there and that he wanted me to resign effective at the end of the contract year or he would reassign me to a position like transportation, in the transportation department; and then he told me that he would help me find another job.
Q. Anything else?
A. He mentioned Jackie Gilbert.

4

After the meeting, Culver had additional contact with Finch during the workday and into the evening (via telephone) to determine whether Finch would resign. The following morning, Friday, February 26, a FBISD police car blocked Finch in her driveway. The police officer delivered a letter from the associate superintendent of human resources reassigning Finch to an unspecified position, instructing Finch to meet with Hooper on Monday morning, and directing Finch not to go to Lake Olympia Middle School. On Monday, Finch met Hooper and was assigned to the maintenance department.

Later that week, Hooper provided Finch with written notice that she was being reassigned to the specific position of Facilitator for Classified Staff Development. The written notice provided reasons for the reassignment:

1. Failure to maintain an effective working relationship with FBISD administrators/colleagues;

2. Failure to cooperate with and to timely prepare documents needed in connection with a special education matter;

---

Q. What about that did he mention?
A. He was unhappy about that.
Q. What did he say that he was unhappy about?
A. I don't recall. I don't recall right at this moment. I have recalled it previously, but I don't know. And there were probably other things that were said during that very short meeting.
Q. How long a meeting do you think it was?
A. It was short. Maybe 10 minutes.
   He also said -- is it okay, if I remember something, that I tell you?
Q. Yes.
A. He also said that he -- after I talked with him about it -- he told me he didn't like the School Within a School proposal, that he was absolutely sick of that. So I said, "Well, that can be withdrawn."

5

3.      Failure to follow established policies and procedures; and

4.      Insubordination.

In addition, the notice informed Finch she could present any concerns she had regarding the reassignment through the FBISD grievance process. Finch's salary remained unchanged.

Finch filed a grievance. In April, Hooper conducted a Level III grievance hearing, with Finch represented by counsel. Following an adverse result, Finch appealed the Level III grievance hearing to the FBISD board of trustees.[2] The board held an evidentiary hearing, referred to as a Level IV grievance hearing, in May, with both sides represented by counsel. The board ultimately took no action on Finch's grievance, which effectively upheld the Level III decision. Finch resigned from FBISD in July.

Finch sued the Superintendents and FBISD in federal court, bringing: (1) a procedural due process claim alleging that Finch was entitled to, but did not receive, a pre-termination hearing; (2) a substantive due process claim; (3) First Amendment claims based on Finch's speech regarding the "School Within a School" proposal and her associations with members of the school board; (4) claims under the Texas Constitution that track her First Amendment claims; (5) a state law claim for intentional infliction of emotional distress; and (6) a state law claim for breach of contract.[3]

_____

[2] Finch asserts an additional Level III grievance hearing between Hooper and Finch occurred on March 10. Finch's attorney appeared part-way through that meeting. Nothing turns on how the March 10 meeting is classified.

[3] Finch's complaint includes an additional count of violation of a liberty interest in her good name. In *Paul v. Davis*, 424 U.S. 693, 711-12 (1976), the Supreme Court held that mere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interest. *See also Conn. Dep't of Pub. Safety v. Doe*, __ U.S. __, 123 S.Ct. 1160, 1164 (2003) (discussing reputation in context of Megan's law); c*ompare Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989), *with id.* at 399-401 (Jolly, J., dissenting).

6

The Superintendents moved for summary judgment predicated on qualified immunity. The district court denied the motion, finding Finch was given virtually no prior notice of the reassignment and finding a genuine issue of fact over whether Finch's reassignment was a demotion. The Superintendents appealed.

## II. STANDARD OF REVIEW

By way of motion, Finch contends the Court is deprived of jurisdiction to consider this appeal. To deny a summary judgment motion based on qualified immunity, a district court must determine both (1) that certain conduct "violate[d] clearly established statutory rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), and (2) that a genuine issue of fact exists regarding whether the defendant engaged in such conduct. *See Kinney v. Weaver*, 301 F.3d 253, 261 (5th Cir. 2002). On interlocutory appeal, this Court may review only the first question. *See Johnson v. Jones*, 515 U.S. 304, 313, 319 (1995); *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000) ("[W]e can review the *materiality* of any factual disputes, but not their *genuineness*.") (emphasis in original). The court below denied the motion for summary judgment "[b]ecause genuine issues of *material* fact exist[.]" (emphasis added). Thus, this Court has jurisdiction to hear this interlocutory appeal insofar as it challenges the district court's determination of materiality.

In this situation, the Court reviews *de novo*. *See Benningfield v. City of Houston*, 157 F.3d 369, 374 (5th Cir. 1998). "In making [a] legal determination on the materiality of the facts at issue, we review the complaint and record to determine whether, *assuming that the plaintiff's version of the facts is true*, those facts are materially sufficient to establish that the defendants acted in an objectively

7

unreasonable manner in light of clearly established law." *Kinney*, 301 F.3d at 261 (internal citations omitted, emphasis added).

# III. DISCUSSION

The court must engage in a two-step analysis to determine whether an official is entitled to qualified immunity. First, the court must determine whether the plaintiff's allegations make out a violation of a clearly established constitutional right. If such a right is shown, the court must determine if the right was clearly established at the time of the events in question. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. *See Lukan v. North Forest Indep. Sch. Dist.*, 183 F.3d 342, 346 (5th Cir. 1999). Our discussion focuses on whether plaintiff's allegations make out a violation of a clearly established constitutional right.

A.

Finch contends that her reassignment effected a constructive discharge that counts as a "termination," such that she was entitled to a pre-termination hearing under Texas law. She argues that Hooper and Culver's failure to afford her a pre-termination hearing violated her right to procedural due process. Although our cases indicate that pre-termination hearings apply to a constructive discharge only where an employer forces its employee to choose between resigning or being fired, *see Fowler v. Carrollton Pub. Library*, 799 F.2d 976, 980 (5th Cir. 1986), and such was not the case here, Finch's argument fails on the more elementary ground that she was not constructively discharged on the date she claims.

8

To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Finch argues that she was constructively discharged from her employment with FBISD on the date of her reassignment, but many of the working conditions she relies on to show constructive discharge developed during the 4 1/2 month period between her reassignment and her resignation. Thus, Finch's own account of the facts does not support a finding that she was constructively discharged on the earlier date. Her account establishes instead that the working conditions in the maintenance department became intolerable to her around the time that she resigned.

The essential requirements of procedural due process under the Constitution are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). There is no dispute that: Finch met with Culver and Hooper prior to her reassignment; Finch received written notice of the reasons for her reassignment; Finch received written notice informing her of the opportunity to use the grievance process; Finch had at least one Level III grievance hearing before Hooper, with counsel representing Finch; and Finch had a Level IV grievance hearing in front of the school board, with counsel representing Finch and with Finch testifying under oath. Because the grievance process gave Finch an opportunity to present her basic argument—that she should be working as a school principal rather than in the maintenance department—and the process was complete before she resigned, procedural due process is satisfied.

B.

Public officials violate substantive due process rights if they act arbitrarily or capriciously. *See Delahoussaye v. City of New Iberia*, 937 F.2d 144, 149 (5th Cir. 1991); *Fowler v. Smith*, 68 F.3d

9

124, 128 (5th Cir. 1995). To the extent Finch's substantive due process claim is based on her First Amendment claims, the merits of this argument stand or fall based on the merits of the First Amendment argument discussed *infra*. *See Fowler*, 68 F.3d at 128.

To the extent Finch's substantive due process claim is not based on First Amendment claims, this Court must determine whether an action was a rational means of advancing a legitimate government purpose. *See Fowler*, 68 at 128. Finch appears to argue the Superintendents acted arbitrarily or capriciously when they reassigned her, given that she: did nothing wrong; followed instructions; had an evaluation of "outstanding"; received a raise; obtained a two-year term contract; and had nothing negative in her employment file. Although the Superintendents provide evidence allegedly showing Finch's poor job performance, they do not (and cannot under our standard of review, which construes the evidence in the light most favorable to the plaintiff) base their argument in favor of qualified immunity on it. Instead, they assert that in light of their evidence, Hooper had sufficient reason to *believe* Finch had engaged in such activity. *See Fowler*, 68 F.3d at 128.

Finch's evidence shows that at the February 25 meeting, Hooper expressed concern over Finch's compatibility with Hooper, Finch's ability to control parents, Finch's defense of Jackie Gilbert, and the possibility that news coverage of an alleged rape at Finch's old school might damage Hooper. In light of Hooper's negative appraisals of Finch's ability to interact with parents and to exercise judgment in hiring, Finch's reassignment to a position with minimal parental interaction and hiring authority was a rational means of advancing a legitimate governmental purpose.

## C.

Finch asserts the Superintendents violated her rights to freedom of speech and association under

both the United States and Texas Constitutions.[4]  The government may not constitutionally compel persons to relinquish their First Amendment rights as a condition of public employment. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999).

1.

A plaintiff must satisfy four elements to recover for a free speech retaliation claim: (1) the plaintiff must suffer an adverse employment decision; (2) the plaintiff's speech must involve a matter of public concern; (3) the plaintiff's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the plaintiff's speech must have motivated the defendant's actions.  *Harris*, 168 F.3d at 216.

We assume that Finch's reassignment constitutes an adverse employment decision, such that she satisfies the first element of *Harris*.

"[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *See Connick v. Myers*, 461 U.S. 138, 147 (1983).  This Court looks at the content, form, and context of speech, as revealed by the whole record, in determining whether speech addresses a matter of public concern. *Id.* at 147-48; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1050 (5th Cir. 1996).  Finch drafted a proposal and presented it on two occasions, first to her immediate supervisor, and second to the FBISD executive

---

[4] Although the Texas Constitution grants broader protection to speech than does the United States Constitution, *see Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994), Finch has not included in her brief any argument concerning how this broader scope affects her claims. Consequently, we analyze Finch's claims under the United States Constitution.

cabinet almost a year later. Finch also discussed the proposal with members of the school board. The content of Finch's speech deals with the internal administrative approach to running a school. The speech came in the form of a proposal delivered to Finch's superiors. Although Finch attempts to place her proposal in the context of the national debate over school choice, she fails to show how her proposal was actually aired or considered in any "widespread debate in the community." *See Harris*, 168 F.3d at 226 (Smith, J., dissenting). To the contrary, the record indicates Finch's speech first arose in the context of follow-up to a meeting among Area I principals in the FBISD. Thus, Finch fails to satisfy the second element of *Harris*, and her free speech retaliation claim fails.[5]

2.

Finch alleges the violation of various purported associational rights. First, she argues that being reassigned to a position where she was isolated and being instructed to not return to Lake Olympia Middle School violated her freedom of association. Second, she argues that she was punished for speaking to members of the media and meeting with parents and school board members. Some of these alleged violations of associational rights occurred *after* Finch was reassigned. It is untenable to argue Finch's reassignment was taken in retaliation for such associations. In any event, Finch does not provide any case law explaining how restraining these types of interactions implicates the rights of intimate or expressive association protected by the Constitution. *See Roberts v. United States Jaycees*, 468 U.S. 609, 618-23 (1984).

---

[5] Under narrow circumstances, an employee's speech as *employee* qualifies as speech on matters of public concern, where the speech involves the report of corruption or wrongdoing to higher authorities. *See Wallace*, 80 F.3d at 1050-51 (enumerating examples, such as a whistle blower or a police chief reporting suspected criminal activity by a city council member). There is no allegation or evidence to suggest Finch's "School Within a School" advocacy involved a report of corruption or wrongdoing.

D.

The Superintendents argue that, notwithstanding any constitutional violations that may have occurred, they are entitled to qualified immunity because their conduct was objectively reasonable. *See Lukan*, 183 F.3d at 346; *Harlow*, 457 U.S. at 818; *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (noting public officials are pro tected from personal monetary liability only so long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known"). Because the evidence, when construed in the light most favorable to Finch, demonstrates none of her constitutional rights were violated, we do not address the Superintendents' argument.

E.

The Superintendents assert this Court should reach the question of whether they are immune from Finch's intentional infliction of emotional distress claim and that the Court should grant them professional immunity. Finch responds that this issue cannot be reached because the Superintendents failed to include it in their notice of appeal. Federal Rule of Appellate Procedure 3(c) states: "The notice of appeal must . . . designate the judgment, order, or part thereof being appealed". FED. R. APP. P. 3(c). When an appellant chooses to appeal specific determinations of the district court–rather than simply appealing from an entire judgment–only the specified issues may be raised on appeal. *See Pope v. MCI Telecomm. Corp.*, 937 F.2d 258, 266 (5th Cir. 1991). The notice of appeal states:

> Notice is hereby given that Don Hooper and Arthur Culver . . . appeal to the United States Court for the Fifth Circuit pursuant to 28 U.S.C. § 1291 from the Order entered in this action on August 1, 2002, denying Defendants' Motion for Summary Judgment asserting the defense of qualified immunity against Plaintiff's claims brought pursuant to 42 U.S.C. § 1983.

Finch argues that this notice only appeals the qualified immunity issues and not the professional

13

immunity issue. To the contrary, it is clear that where the notice of appeal uses the phrase "asserting the defense of qualified immunity," it is describing the defendants' summary judgment motion, and not the district court's August 1 order which denied all of the Superintendents' arguments based on immunity.

Although the notice of appeal includes the professional immunity issue, this Court does not automatically have jurisdiction to consider interlocutory appeals of questions of professional immunity. Rather, we have discretion to exercise pendent jurisdiction. *See Morin v. Caire*, 77 F.3d 116, 119 (5th Cir. 1996) ("Although the immunity exception does not apply to the decision to deny the plaintiff's state law claims, we also may have jurisdiction to review that decision. In the interest of judicial economy, this court may exercise its discretion to consider under pendent appellate jurisdiction claims that are closely related to the issue properly before us.").

Finch brought two claims under state law: intentional infliction of emotional distress and breach of contract. The Superintendents do not assert they are immune from the contract claim. There is little judicial economy in our exercising pendent jurisdiction over the state law tort where the government officials must continue to participate in the proceedings. This is particularly true in light of the sparse briefing of this issue by both parties. We decline to exercise pendent jurisdiction.

## IV. CONCLUSION

For the reasons stated, we REVERSE IN PART the order of the district court denying summary judgment and hold that the Superintendents are entitled to qualified immunity from Finch's constitutional claims. We DISMISS the appeal as it relates to the issue of professional immunity from the intentional infliction of emotional distress claim.

Finch's motion to file a sur-reply is GRANTED; the Superintendents' motion to dismiss for lack

14

of subject matter jurisdiction is DENIED.