Filed 3/26/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OLIVIA DE HAVILLAND, | B285629 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC667011) |
| v. | |
| FX NETWORKS, LLC et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Holly E. Kendig, Judge. Reversed with directions.

Munger, Tolles & Olson, Glenn D. Pomerantz, Kelly M. Klaus, Fred A. Rowley, Jr., and Mark R. Yohalem for Defendants and Appellants.

Horvitz & Levy, Frederic D. Cohen and Mark A. Kressel for Motion Picture Association of America, Inc. and Netflix, Inc. as Amici Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine, Kelli L. Sager and Rochelle L. Wilcox for A&E Television Networks, LLC, Discovery Communications, LLC, Imperative Entertainment, LLC, Urban One, Inc., Critical Content, LLC, Reporters' Committee for Freedom of the Press, and First Amendment Coalition as Amici Curiae on behalf of Defendants and Appellants.

Jennifer E. Rothman and Eugene Volokh for Intellectual Property and Constitutional Law Professors as Amici Curiae on behalf of Defendants and Appellants.

Daniel K. Nazer for Electronic Frontier Foundation, Organization for Transformative Works, and Wikimedia Foundation as Amici Curiae on behalf of Defendants and Appellants.

Jack Lerner, UCI Intellectual Property, Arts, and Technology Clinic, for International Documentary Association as Amicus Curiae on behalf of Defendants and Appellants.

Howarth & Smith, Don Howarth, Suzelle M. Smith, and Zoe E. Tremayne for Plaintiff and Respondent.

Duncan W. Crabtree-Ireland and Danielle S. Van Lier for Screen Actors Guild-American Federation of Television and Radio Artists as Amicus Curiae on behalf of Plaintiff and Respondent.

Authors write books.  Filmmakers make films.  Playwrights craft plays.  And television writers, directors, and producers create television shows and put them on the air -- or, in these modern times, online.  The First Amendment protects these expressive works and the free speech rights of their creators.  Some of these works are fiction.  Some are factual.  And some are a combination of fact and fiction.  That these creative works generate income for their creators does not diminish their constitutional protection.  The First Amendment does not require authors, filmmakers, playwrights, and television producers to provide their creations to the public at no charge.

Books, films, plays, and television shows often portray real people.  Some are famous and some are just ordinary folks.  Whether a person portrayed in one of these expressive works is a world-renowned film star -- "a living legend" -- or a person no one knows, she or he does not own history.  Nor does she or he have the legal right to control, dictate, approve, disapprove, or veto the creator's portrayal of actual people.

In this case, actress Olivia de Havilland sues FX Networks, LLC and Pacific 2.1 Entertainment Group, Inc. (collectively FX), the creators and producers of the television miniseries *Feud*: *Bette and Joan*.  In the docudrama about film stars Bette Davis and Joan Crawford, an actress plays de Havilland, a close friend of Davis.  De Havilland alleges causes of action for violation of the statutory right of publicity and the common law tort of misappropriation.  De Havilland grounds her claims on her assertion -- which FX does not dispute -- that she "did not give [her] permission to the creators of 'Feud' to use [her] name, identity[,] or image in any manner."  De Havilland also sues for false light invasion of privacy based on FX's portrayal in the

3

docudrama of a fictitious interview and the de Havilland character's reference to her sister as a "bitch" when in fact the term she used was "dragon lady."  De Havilland seeks to enjoin the distribution and broadcast of the television program and to recover money damages.

The trial court denied FX's special motion to strike the complaint.  The court concluded that, because *Feud* tried to portray de Havilland as realistically as possible, the program was not "transformative" under *Comedy III Productions*[1] and therefore not entitled to First Amendment protection.  As appellants and numerous amici point out, this reasoning would render actionable all books, films, plays, and television programs that accurately portray real people.  Indeed, the more realistic the portrayal, the more actionable the expressive work would be. The First Amendment does not permit this result.  We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Feud *airs and de Havilland sues*

In March 2017, FX began airing its eight-part docudrama, *Feud: Bette and Joan.*  The docudrama portrays the rivalry between actresses Joan Crawford and Bette Davis.  The central theme of the program is that powerful men in Hollywood pressured and manipulated women in the industry into very public feuds with one another to advance the economic interests of those men and the institutions they headed.  A secondary theme -- as timely now as it was in the 1960's -- is the poor treatment by Hollywood of actresses as they age.

---

[1]     *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387 (*Comedy III*).

Academy-Award-winning actress Catherine Zeta-Jones portrays de Havilland in the docudrama. The de Havilland role is a limited one, consuming fewer than 17 minutes of the 392-minute, eight-episode miniseries. The role consists essentially of two parts: (1) a fictitious interview in which Zeta-Jones -- often accompanied by Academy-Award-winning actress Kathy Bates playing actress Joan Blondell -- talks to an interviewer (a young man named "Adam") about Hollywood, its treatment of women, and the Crawford/Davis rivalry; and (2) scenes in which Zeta-Jones interacts with Academy-Award-winning actress Susan Sarandon playing Bette Davis. These scenes portray the close friendship between Davis and de Havilland. As played by Zeta-Jones, the de Havilland character is portrayed as beautiful, glamorous, self-assured, and considerably ahead of her time in her views on the importance of equality and respect for women in Hollywood. *Feud* was nominated for 18 Emmy awards.

On June 30, 2017, de Havilland filed this lawsuit. Her Third Amended Complaint, filed in September 2017, alleges four causes of action: (1) the common law privacy tort of misappropriation; (2) violation of Civil Code section 3344, California's statutory right of publicity; (3) false light invasion of privacy; and (4) "unjust enrichment." De Havilland asks for damages for emotional distress and harm to her reputation; "past and future" "economic losses"; FX's "profits gained . . . from and

attributable to the unauthorized use of [her] name, photograph,[2] or likeness"; punitive damages; attorney fees; and a permanent injunction prohibiting the "broadcast and distribution" of the series.[3]

---

[2] There seems to be only one photograph to which de Havilland could be referring. At the end of the miniseries, just before the credits, *Feud* displays side-by-side photographs of the real people who had some involvement in the story and the actor who played each. These include director Robert Aldrich (played by Alfred Molina), Jack Warner of Warner Brothers (played by Stanley Tucci), Joan Crawford (played by Jessica Lange), Victor Buono (played by Dominic Burgess), Bette Davis's daughter B.D. Merrill (played by Kiernan Shipka), and Hedda Hopper (played by Judy Davis), as well as Davis and de Havilland, played, as noted, by Sarandon and Zeta-Jones, respectively. A short blurb tells the viewer what became of each person. For de Havilland, the blurb states, "Olivia de Havilland made her screen debut in Max Reinhardt's *A Midsummer Night's Dream* in 1935. She retired from film acting in 1988. She continues to enjoy her retirement in Paris. On July 1, 2016, she turned 100 years old." De Havilland attached a copy of the side-by-side photographs of her and Zeta-Jones to her complaint.

[3] On July 25, 2017, de Havilland filed a motion for trial setting preference. De Havilland submitted a declaration stating she lives in Paris and is 101 years old. She also submitted a declaration by a Los Angeles physician stating that any person of that age "will not survive for any extended period of time."

2. ***FX's special motion to strike***

    a. *FX's motion, declarations, and exhibits*

On August 29, 2017, FX filed a motion to strike the complaint under California's anti-SLAPP[4] law, Code of Civil Procedure section 425.16. FX submitted declarations from Ryan Murphy, a co-creator, executive producer, writer, and director of *Feud*; Michael Zam, a screenwriter who co-wrote a script called *Best Actress* on which *Feud* was based in part; and Timothy Minear, an executive producer and writer for *Feud*. Minear explained the writers on the project created "imagined interviews" conducted at the 1978 Academy Awards as a "framing device" to introduce viewers to *Feud*'s themes such as the unfair treatment of women in Hollywood. Minear stated *Feud*'s writers based the imagined interview on actual interviews de Havilland had given over the years. Minear also explained that a "docudrama" is a "dramatized retelling of history."

FX also submitted a declaration from Stephanie Gibbons, its president of marketing and promotion. Gibbons stated FX had not used de Havilland's photograph in any advertising or promotion for the miniseries. Six of 44 video advertisements included pictures of Zeta-Jones; none of these used de Havilland's name. Gibbons explained that Zeta-Jones is a famous actress whom FX thought viewers would want to watch.

---

[4] SLAPP is an acronym for strategic lawsuit against public participation. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 76, fn. 1 (*Christian Research*).)

FX submitted the declaration of James Berkley, a research analyst for FX's law firm, together with 59 exhibits. These included books, newspaper and magazine articles, and videos of de Havilland appearing as a guest on talk shows. In a number of the articles and video clips, de Havilland granted interviews and made statements about other actors, including her sister Joan Fontaine. In a July 2016 Associated Press interview -- on the occasion of her one hundredth birthday -- de Havilland said this about her sister: "Dragon Lady, as I eventually decided to call her, was a brilliant, multi-talented person, but with an astigmatism in her perception of people and events which often caused her to react in an unfair and even injurious way."

b. *De Havilland's opposition, declarations, and exhibits*

De Havilland filed an opposition on September 15, 2017. She asserted *Feud* was a "commercial production." De Havilland attached a declaration from Mark Roesler, the chairman of Celebrity Valuations. Roesler declared he had represented many celebrities over the years, including Richard Nixon. Roesler calculated the fair market value of FX's "use" in *Feud* of de Havilland's "rights" to be between 1.38 and 2.1 million dollars. This works out to between approximately $84,000 and $127,000 per minute of time that Zeta-Jones appears on screen.

De Havilland also submitted declarations from David Ladd and Cort Casady. Both men stated they have many years of experience in the entertainment business. In nearly identical language both Ladd and Casady declared the "standard practice" in the film and television industry is to obtain consent from any "well-known living person" before her or his "name, identity, character[,] or image" can be used in a film or television

program.[5]  In addition, de Havilland submitted a declaration from her attorney attaching posts from Instagram and Facebook with photographs of Zeta-Jones as de Havilland.

c. *FX's reply*

FX filed a reply on September 22, 2017.  FX submitted a declaration from Casey LaLonde, Joan Crawford's grandson. LaLonde stated an actor portraying him as a child appears in *Feud*.  LaLonde neither granted consent nor received any compensation for this portrayal.  LaLonde described the experience of seeing an actor portraying him in the docudrama as "a wonderful surprise."  LaLonde also made available to *Feud*'s producers home movies of Crawford.  He stated the producers did not pay any compensation to Crawford's family for their portrayal of her.  LaLonde declared that de Havilland's attorney's statement to *USA Today* that *Feud*'s producers had compensated Crawford's family for the use of her identity was untrue.

d. *The hearing on the motion and the trial court's ruling*

On September 29, 2017, the parties argued the motion. The superior court issued a 16-page written decision.  The court denied the anti-SLAPP motion as to all four causes of action.  The court first found the docudrama constitutes speech in a public forum, involving an issue of public concern.  Noting the burden then shifts to the plaintiff to show a probability of prevailing on her claims, the court concluded de Havilland had sufficiently met

---

[5]  Casady stated consent "must be obtained."  Ladd stated consent "should be obtained."  Ladd added that, "[i]f consent could not be obtained," then the producers could use only "authenticated facts previously disclosed" by the person herself or himself.

her burden of proof. The court stated de Havilland had to show only that her lawsuit had minimal merit.

The trial court said de Havilland had met her burden on her right of publicity claims "because no compensation was given despite using her name and likeness." The court, citing Ladd's declaration, stated, "[I]t is standard in the industry, according to Plaintiff, to negotiate compensation prior to the use of a person's likeness." The court said there was "nothing transformative about [*Feud*]" within the meaning of *Comedy III* because FX admitted it "wanted to make the appearance of [de Havilland] as real as possible."

On de Havilland's false light claim, the court noted de Havilland asserted (1) she had not given an interview at the 1978 Academy Awards; (2) she had not referred to her sister Joan Fontaine as "my bitch sister"; (3) she never told a director she didn't "play bitches" and he should call her sister; and (4) when asked where the alcohol in Frank Sinatra's dressing room had gone, she never said "Frank must have drunk it all." Rejecting FX's argument that these portrayals are not defamatory, the court said, "[I]n considering the show as a whole, the Court finds [de Havilland] has sufficiently met her burden of proof in that a viewer of the television show, which is represented to be based on historical facts, may think [de Havilland] to be a gossip who uses vulgar terms about other individuals, including her sister." Citing the Casady declaration, the court stated, "For a celebrity, this could have a significant economic impact."

As to actual malice (de Havilland did not dispute she is a public figure),[6] the court concluded de Havilland had "submitted

---

[6] De Havilland again concedes on appeal that she is a public figure.

10

sufficient evidence that [FX] presented scenes 'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' "  The court seemed unreceptive to FX's argument that "false" is different from "dramatized."  Finally, the trial court rejected FX's argument that de Havilland's fourth cause of action for "unjust enrichment" was not a cause of action.

## DISCUSSION

### 1. *California's anti-SLAPP statute and our standard of review on appeal*

A special motion to strike under the anti-SLAPP statute, Code of Civil Procedure section 425.16, " 'is a procedural remedy to dispose of lawsuits brought to chill the valid exercise of a party's constitutional right of petition or free speech.  [Citation.] The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.]  The Legislature has declared that the statute must be "construed broadly" to that end.' " (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268; see also Code Civ. Proc., § 425.16(a); cf. *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1114, fn. 3 [an appellate court, whenever possible, should interpret the First Amendment and section 425.16 in a manner "favorable to the exercise of freedom of speech, not its curtailment"].)  This legislative directive "is expressed in unambiguous terms." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1119.)  "[T]he broad construction expressly called for in subdivision (a) of section 425.16 is desirable from the standpoint of judicial efficiency." (*Id*. at pp. 1121-1122.)

11

"Resolution of an anti-SLAPP motion 'requires the court to engage in a two-step process.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) First, the defendant must show the conduct underlying the plaintiff's cause of action arises from the defendant's constitutional rights of free speech or petition in connection with a public issue. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the defendant satisfies this prong, the burden shifts to the plaintiff to prove she has a legally sufficient claim and to prove with admissible evidence a probability that she will prevail on the claim. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821; see also *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 ["In opposing an anti-SLAPP motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial."].) "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker,* at p. 821; see also *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1251 (*Jackson*).) "[O]n its face the [anti-SLAPP] statute contemplates consideration of the substantive merits of the plaintiff's complaint, as well as all available defenses to it, including, but not limited to, constitutional defenses. This broad approach is required not only by the language of the statute, but by the policy reasons [that]

12

gave rise to our anti-SLAPP statute." (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398.)

To satisfy this prong-two showing, the plaintiff must present credible evidence that satisfies the standard of proof required by the substantive law of the cause of action the anti-SLAPP motion challenges. Generally, a plaintiff's claims need only have " 'minimal merit' " to survive an anti-SLAPP motion. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11.) But when the plaintiff is a public figure, to establish a prima facie case she must demonstrate by clear and convincing evidence that the defendant acted with "actual malice." (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1162, 1169-1172 [trial court should have granted anti-SLAPP motion where limited purpose public figure plaintiff "failed to show a probability of proving actual malice by clear and convincing evidence"]; *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451, 1454 [to meet anti-SLAPP statute's requirement that he show he would "probably" prevail on his claim, public figure plaintiff "was required to 'show a likelihood that he could produce clear and convincing evidence' " that defendant made statements with actual malice]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 950 ["The clear and convincing standard requires that the evidence be such as to command the unhesitating assent of every reasonable mind. [Citation.] Actual malice cannot be implied and must be proven by direct evidence"]; see also *Makaeff v. Trump University, LLC* (9th Cir. 2013) 715 F.3d 254, 271 [whether plaintiff has "reasonable probability of proving, by clear and convincing evidence, that [defendant] made her critical statements with actual malice" is "inherently fact-intensive question"].) "The requirement that a public figure plaintiff prove malice by clear

13

and convincing evidence arises from First Amendment concerns that freedom of expression be provided 'the "breathing space" that [it] "need[s] . . . to survive . . . ." ' " (*Christian Research*, *supra*, 148 Cal.App.4th at p. 82, quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 272 [11 L.Ed. 2d 686].)

"An order denying an anti-SLAPP special motion to strike is appealable under [Code of Civil Procedure] sections 425.16, subdivision (i), and 904.1." (*Christian Research, supra,* 148 Cal.App.4th at p. 79.)  Our review of the trial court's order denying FX's motion "is de novo, and entails an independent review of the entire record."  (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 371; see also *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1408 ["An appellate court reviews an order denying an anti-SLAPP motion from a clean slate"].)

2. ***De Havilland concedes FX met the first prong of the two-step process***

The trial court found that de Havilland's lawsuit arises from FX's exercise of its free speech rights on a topic of public interest in a public forum.  De Havilland presented no argument on that issue in her opposition brief.  At oral argument, her counsel conceded FX has met the first prong of the anti-SLAPP analysis.

3. ***The First Amendment protects FX's portrayal of de Havilland in a docudrama without her permission***

a. *We question whether a docudrama is a product or merchandise within the meaning of Civil Code section 3344*

As noted, de Havilland alleges causes of action for violation of the statutory right of publicity, Civil Code section 3344, and for the common law tort of misappropriation.  Section 3344,

14

subdivision (a) provides, in part, "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in *products, merchandise, or goods*, or for purposes of advertising or selling, or soliciting purchases of, *products, merchandise, goods, or services*, without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." (Italics added.) Misappropriation is one of the four branches of the privacy tort identified by Dean William Prosser. (Prosser, *Privacy* (1960) 48 Cal. L.Rev. 383, 389; see generally 5 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 756, p. 1043.) The Restatement Second of Torts adopted Prosser's classification. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 24.) "California common law has generally followed Prosser's classification of privacy interests as embodied in the Restatement." (*Ibid.*) The Restatement defines the misappropriation tort: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." (Rest.2d Torts § 652C.)

De Havilland's statutory claim raises a preliminary question of whether the portrayal of a real person in a television program (or a book, play, or film) constitutes the "use" of that person's name or "likeness" "on or in" a product, merchandise, or good. Books, films, and television shows are "things" but are they "merchandise" or "products"? Many of the cases in this area involve products and merchandise such as T-shirts and lithographs (*Comedy III*, *ante*), greeting cards (*Hilton v. Hallmark Cards* (9th Cir. 2010) 599 F.3d 894), and video games (*Davis v. Elec. Arts, Inc.* (9th Cir. 2015) 775 F.3d 1172; *In re NCAA Student-Athlete Name & Likeness* (9th Cir. 2013) 724 F.3d

15

1268; *Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47), or advertisements for products and merchandise. (See, e.g., *Newcombe v. Adolf Coors Co.* (9th Cir. 1998) 157 F.3d 686, 691-694 [beer advertisement]; *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093 [advertisement for SalsaRio Doritos]; *Midler v. Ford Motor Co.* (9th Cir. 1988) 849 F.2d 460 [advertisement for Ford Lincoln Mercury]; cf. CACI No. 1804A [to establish violation of Civil Code section 3344, plaintiff must prove (among other elements) that defendant knowingly used plaintiff's name or likeness "on merchandise/[or] to advertise or sell [*describe what is being advertised or sold*]" and that defendant's use of plaintiff's name or likeness "was directly connected to [defendant's] commercial purpose."].)

The United States Court of Appeals for the Ninth Circuit addressed this question in a recent case, *Sarver v. Chartier* (9th Cir. 2016) 813 F.3d 891 (*Sarver*). A United States Army sergeant who had served in Iraq sued the screenwriter, director, and producer of the motion picture *The Hurt Locker*. The plaintiff alleged "he did not consent to [the] use [of his life and experiences in the film] and that several scenes in the film falsely portray him in a way that has harmed his reputation." (*Id.* at p. 896.) He asserted causes of action for (among other torts) misappropriation of his likeness and violation of the right of publicity, false light invasion of privacy, and defamation. (*Ibid.*) The appellate court affirmed the district court's dismissal of the lawsuit under our anti-SLAPP statute. The court observed "*The Hurt Locker* is not speech proposing a commercial transaction." (*Id.* at p. 905.) The court discussed *Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562 [53 L.Ed.2d 965] (*Zacchini*), the only United States Supreme Court case to "review[] the

16

constitutionality of a state's right of publicity law."  (*Sarver,* at p. 903.)  An Ohio television station broadcast 15 seconds of Zacchini performing his "human cannonball" act.  Zacchini sued for violation of his right of publicity under Ohio law.  The Court concluded the First Amendment interests in broadcasting Zacchini's *entire* act -- rather than, for example, his name or picture -- was minimal.  (*Zacchini*, at pp. 563-564, 573.)  The *Sarver* court noted that, in the intervening forty years, the "Court has not revisited the question of when a state's right of publicity law is consistent with the First Amendment." (*Sarver,* at p. 904; see also *Matthews v. Wozencraft* (5th Cir. 1994) 15 F.3d 432, 439 (*Matthews*) [" 'Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features, or biography in a literary work, motion picture, news or entertainment story.  Only the use of an individual's identity in advertising infringes on the persona.' "].)

We need not decide this question, however, because *Feud* is constitutionally protected in any event.

b.  *Assuming a docudrama is a "use" for purposes of the right of publicity, the First Amendment protects* Feud

Assuming for argument's sake that a television program is a "product, merchandise, or good" and that Zeta-Jones's portrayal of de Havilland constitutes a "use" of de Havilland's name or likeness within the scope of both the right of publicity statute and the misappropriation tort, we come to FX's First Amendment defense.  Nearly 40 years ago, the Chief Justice of our Supreme Court addressed this issue in *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860 (*Guglielmi*).  The case involved a television program that was a "fictionalized version" of the life of actor Rudolph Valentino.  Valentino had died years earlier and

his nephew Guglielmi sued, alleging misappropriation of Valentino's right of publicity and seeking damages and injunctive relief. The Court affirmed the dismissal of the complaint on the ground that, at the time, the right of publicity was not descendible to heirs.

In a concurring opinion joined by three other justices, the Chief Justice framed the issue as whether the use of a celebrity's "name and likeness in a fictional film exhibited on television constitutes an actionable infringement of that person's right of publicity." (*Guglielmi*, *supra*, 25 Cal.3d at p. 862.) She concluded, "It is clear that [Guglielmi's] action cannot be maintained." (*Ibid.*) The Chief Justice noted Guglielmi alleged the television production company "knew that the film did not truthfully portray Valentino's life." (*Ibid.*) She summarized Guglielmi's contentions: the film was not entitled to constitutional protection because the producers "incorporated Valentino's name and likeness in: (1) a work of fiction, (2) for financial gain, (3) knowing that such film falsely portrayed Valentino's life." (*Id*. at p. 865.) The Chief Justice noted Guglielmi's argument "reveal[ed] a fundamental misconception of the nature of the constitutional guarantees of free expression," adding, "Our courts have often observed that entertainment is entitled to the same constitutional protection as the exposition of ideas." (*Id*. at pp. 865-867.) "Thus," the justice said, "no distinction may be drawn in this context between fictional and factual accounts of Valentino's life." (*Id*. at p. 868.) "[T]ruthful and fictional accounts" "have equal constitutional stature." (*Id*. at p. 871.) The Chief Justice "readily dismissed" Guglielmi's next argument, stating, "The First Amendment is not limited to those who publish without charge." (*Id*. at p. 868.)

18

The Chief Justice wrote, "Valentino was a Hollywood star. His life and career are part of the cultural history of an era. . . . His lingering persona is an apt topic for poetry or song, biography or fiction.  Whether [the producers'] work constitutes a serious appraisal of Valentino's stature or mere fantasy is a judgment left to the reader or viewer, not the courts." (*Guglielmi, supra*, 25 Cal.3d at pp. 869-870.)

In the nearly four decades since, our Supreme Court and courts of appeal have continued to cite *Guglielmi* with approval. (See, e.g., *Comedy III, supra*, 25 Cal.4th at pp. 396-398, 401-402, 406; *Winter v. DC Comics* (2003) 30 Cal.4th 881, 887-888, 891 (*Winter*); *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 145 (*Tamkin*); *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280; *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 324-325 (*Polydoros*).) Federal courts applying California law have as well.  (See, e.g., *Sarver, supra*, 813 F.3d at p. 905, fn. 9 [noting *Guglielmi* post-dated *Zacchini* and the four justices "cautioned that the defendants' fictionalized portrayal of Valentino's life was entitled to greater First Amendment protection than the conduct in *Zacchini*"].)

*Feud* is as constitutionally protected as was the film in *Sarver*, *The Hurt Locker*.  As with that expressive work, *Feud* "is speech that is fully protected by the First Amendment, which safeguards the storytellers and artists who take the raw materials of life -- including the stories of real individuals, ordinary or extraordinary -- and transform them into art, be it articles, books, movies, or plays." (*Sarver, supra*, 813 F.3d at p. 905; see also *Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 542 [producer of documentary about surfers

19

in Malibu was entitled to judgment on surfer's claims for violation of common law and statutory right of publicity; "[w]hether [Dora] is considered a celebrity or not, whether he is seeking damages for injury to his feelings or for the commercial value of his name and likeness, . . . the public interest in the subject matter of the program gives rise to a constitutional protection against liability"]; cf. *Polydoros, supra,* 67 Cal.App.4th at pp. 322-325 ["*Guglielmi* unequivocally prevent[ed] [plaintiff] from proceeding on his claim for commercial appropriation of identity" against writer and director of fictional film with character that resembled plaintiff as a child; "[t]o succeed in his claims, [plaintiff] must establish a direct connection between the use of his name or likeness and a *commercial* purpose"]; *The Institute v. Target Corp.* (11th Cir. 2016) 812 F.3d 824, 826 (*Rosa & Raymond Parks*) [books, movie, and plaque depicting civil rights pioneer Rosa Parks were protected under Michigan's constitution]; *Seale v. Gramercy Pictures* (E.D. Pa. 1996) 949 F.Supp. 331 (*Seale*) [First Amendment protected filmmakers' use of name and likeness of Black Panther Party's co-founder; "the creation, production, and promotion of a motion picture and history book [that] integrate[d] fictitious people and events with the historical people and events surrounding the emergence of the Black Panther Party in the late 1960's" constituted First Amendment expression and was not for a commercial purpose]; *Matthews, supra,* 15 F.3d at p. 440 [First Amendment protected book and movie about narcotics officers from misappropriation and false light claims; "[i]t is immaterial whether [the book] 'is viewed as an historical or a fictional work,' [citation], so long as it

is not 'simply a disguised commercial advertisement for the sale of goods or services' "].)[7]

That *Feud*'s creators did not purchase or otherwise procure de Havilland's "rights" to her name or likeness does not change this analysis. Producers of films and television programs may enter into agreements with individuals portrayed in those works for a variety of reasons, including access to the person's recollections or "story" the producers would not otherwise have, or a desire to avoid litigation for a reasonable fee. But the First Amendment simply does not require such acquisition agreements. (*Polydoros, supra,* 67 Cal.App.4th at p. 326 ["[t]he industry custom of obtaining 'clearance' establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits such as this one"]; cf. *Rosa & Raymond*

---

[7] De Havilland relies on *Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409. That case -- which arose from an unusual set of facts -- does not assist our analysis. A tabloid published an article about the supposed involvement of famous actor Clint Eastwood in a "love triangle." Eastwood alleged the article was entirely false. (*Id.* at p. 414.) The court of appeal, citing *Zacchini*, held that Eastwood could proceed with his right of publicity claims. (*Id.* at p. 423.) Here, by contrast, the expressive work at issue is an eight-hour docudrama of which the de Havilland character is but a small part. Moreover, as discussed below, the scenes and lines of which de Havilland complains are permissible literary license and, in any event, not highly offensive to a reasonable person. Unlike *Eastwood*, *Feud*'s creators did not make out of whole cloth an entirely false "article" for economic gain.

21

*Parks, supra,* 812 F.3d at p. 832 [privilege based on state constitution's free speech guarantee was not "contingent on paying a fee"].) The creators of *The People v. O.J. Simpson: American Crime Story* can portray trial judge Lance Ito without acquiring his rights. *Fruitvale Station*'s writer and director Ryan Coogler can portray Bay Area Rapid Transit officer Johannes Mehserle without acquiring his rights. HBO can portray Sarah Palin in *Game Change* without acquiring her rights. There are myriad additional examples.

De Havilland also contends the fictitious interview "is structured as an endorsement of [*Feud*]." The miniseries itself does not support this contention. Nothing Zeta-Jones says or does as de Havilland in the docudrama suggests -- much less constitutes -- an "endorsement" of the work by de Havilland. De Havilland's argument seems to be that, whenever a filmmaker includes a character based on a real person, that inclusion implies an "endorsement" of the film or program by that real person. We have found no case authority to support this novel argument.

Nor does the use of de Havilland's name -- along with photographs of Zeta-Jones -- in social media promotion for the miniseries support de Havilland's claims for violation of her right of publicity. Constitutional protection for an expressive work such as *Feud* " 'extends to the truthful use of a public figure's name and likeness in advertising [that] is merely an adjunct of the protected publication and promotes only the protected publication.' " (*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 797 [First Amendment protected posters that reproduced newspaper stories and photographs of famous quarterback "for two distinct reasons: first, because the posters

22

themselves report newsworthy items of public interest, and second, because a newspaper has a constitutional right to promote itself by reproducing its originally protected articles or photographs"].) "[U]se of a person's name and likeness to advertise a novel, play, or motion picture concerning that individual is not actionable as an infringement of the right of publicity." (*Seale, supra,* 949 F.Supp. at p. 336; see also *Guglielmi, supra,* 25 Cal.3d at pp. 872-873.)

      c.  *In any event,* Feud*'s portrayal of de Havilland is transformative*

The parties spend considerable time discussing the "transformative" test set forth in *Comedy III.* There, a company that owns the rights under Civil Code section 990[8] to The Three Stooges (all three are deceased) sued an artist who had made a charcoal drawing of The Three Stooges, put it on T-shirts and lithographs, and sold those items. The Supreme Court noted the statute imposes liability on a person who uses a deceased personality's name or likeness "either (1) 'on or in' a product, *or* (2) in 'advertising or selling' a product." (*Comedy III, supra,* 25 Cal.4th at p. 395.) The T-shirts and lithographs were, the Court said, "tangible personal property," "consisting of fabric and

---

[8]    Civil Code section 990 has since been renumbered as Civil Code section 3344.1. Enacted in 1984, the statute essentially provides a descendible right of publicity. In language similar to section 3344 governing the rights of living persons, section 3344.1 gives a "deceased personality's" heirs and their assignees a cause of action against someone who uses the deceased person's "name, voice, signature, photograph, or likeness . . . on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent."

ink" and "paper and ink." (*Ibid*.)  The Court found the artist's drawing was an "expressive work[] and not an advertisement for or endorsement of a product."  (*Id*. at p. 396.)  But, the Court continued, "[A] celebrity's heirs and assigns have a legitimate protectable interest in exploiting the value to be obtained from *merchandising* the celebrity's image."  (*Id*. at p. 400, italics added.)

To resolve this "difficult issue" (*Comedy III, supra,* 25 Cal.4th at p. 396), the Court borrowed a concept from copyright law:  " 'whether and to what extent the new work [the product bearing the deceased personality's likeness] is "transformative." ' "  (*Id*. at p. 404.)  The Court held:  "When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist."  (*Id*. at p. 405.)  The Court continued, "Another way of stating the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question."  (*Id*. at p. 406.)  The Court identified a "useful . . . subsidiary inquiry:" "does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted?  If this question is answered in the negative, then there would generally be no actionable right of publicity.  When the value of the work comes principally from some source other than the fame of the celebrity -- from the creativity, skill, and reputation of the artist -- it may be presumed that sufficient transformative

24

elements are present to warrant First Amendment protection." (*Id*. at p. 407.)  Applying its "transformative" test to the sketch artist's T-shirts and lithographs, the Court concluded the charcoal drawing on the shirts and prints was a "literal, conventional depiction[] of The Three Stooges" and therefore not constitutionally protected.  (*Id*. at p. 409.)

*Comedy III*'s "transformative" test makes sense when applied to products and merchandise -- "tangible personal property," in the Supreme Court's words.  Lower courts have struggled mightily, however, to figure out how to apply it to expressive works such as films, plays, and television programs. [9] The trial court's analysis here is a good example.[10]  The court wrote, "[H]ere, because [FX] admit[s] that [it] wanted to make the appearance of [de Havilland] as real as possible . . . , there is nothing transformative about the docudrama.  Moreover, even if [FX] imagined conversations for the sake of being creative, such does not make the show transformative."

We disagree.  The fictitious, "imagined" interview in which Zeta-Jones talks about Hollywood's treatment of women and the

---

[9]     Cf. *Sarver, supra*, 813 F.3d at p. 904, fn. 6 [unnecessary in *Hurt Locker* case to reach affirmative defense of "transformative use"].

[10]     Amici, 22 constitutional law and intellectual property law professors, note they "have serious reservations about the [*Comedy III*] test [as the appropriate test for deciding the federal question of whether and when the First Amendment protects against right of publicity claims] -- highlighted by the trial court's struggle to understand what was meant by a transformative use, and its . . . reading of that test to devalue realistic uses in works of historical fiction and biography."

Crawford/Davis rivalry is a far cry from T-shirts depicting a representational, pedestrian, uncreative drawing of The Three Stooges. The de Havilland role, performed by Zeta-Jones, constitutes about 4.2 percent of *Feud*. The docudrama tells the story, in nearly eight hours, of the competition between Hollywood's leading ladies of the day, Bette Davis and Joan Crawford, for film roles, attention, awards, and acclaim. The miniseries tells many stories within the story as well: Jack Warner's demeaning and dismissive treatment of director Robert Aldrich; Crawford's and Davis's struggles with their personal relationships: husbands, partners, and children; the obstacles faced by capable women like Aldrich's assistant Pauline Jameson who want to direct motion pictures; and the refusal of powerful men in the entertainment business to take women seriously, even when their movies make money.

In the words of the *Comedy III* Court, Zeta-Jones's "celebrity likeness [of de Havilland] is one of the 'raw materials from which [the] original work [*Feud*] is synthesized." (*Comedy III, supra,* 25 Cal.4th at p. 406.) Applying *Comedy III*'s "useful subsidiary inquiry" here, we conclude as a matter of law that *Feud*'s "marketability and economic value" does not "derive primarily from [de Havilland's] fame" but rather "comes principally from . . . the creativity, skill, and reputation" of *Feud*'s creators and actors. Ryan Murphy is a successful screenwriter, director, and producer who counts among his credits the television series *Glee* and the Emmy-award-winning miniseries *The People v. O.J. Simpson: American Crime Story*. Accomplished writers contributed to the script. Highly-regarded and award-winning actors including Susan Sarandon, Jessica Lange, Catherine Zeta-Jones, Stanley Tucci, Alfred Molina, Judy

26

Davis, and Kathy Bates performed in *Feud*. In short, *Feud* constitutes "significant expression" -- a story of two Hollywood legends -- of which the de Havilland character is but a small part. While viewers may have "tuned in" to see these actors and watch this Hollywood tale, there is no evidence that de Havilland as a character was a significant draw. (Cf. *Johnson v. Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880, 895 [use in textbook of article about janitor who found and returned large sum of money was not actionable misappropriation; article was neither "a primary reason for the textbook" "nor was it a substantial factor in the students' purchases of the book"].)

4. ***De Havilland has not carried her burden of proving with admissible evidence that she will probably prevail on her false light claim***

    a. *The allegations of de Havilland's complaint*

In her third cause of action, de Havilland alleges false light invasion of privacy. Though not entirely clear,[11] the complaint

---

[11] De Havilland's complaint blends the allegations concerning her right of publicity claims with those concerning her false light claim. For example, de Havilland alleges the "fake interview" "put[] false words [in her] mouth," "misappropriated [her] name, likeness[,] and identity without her permission and used them falsely in order to exploit their own commercial interests," and "create[d] the public impression that she was a hypocrite, selling gossip in order to promote herself at the Academy Awards." In her third cause of action for false light, de Havilland alleges that she "benefits financially from the authorized use of her own name, likeness, and identity" and that FX's "misappropriation caused" her harm, and she prays for a permanent injunction restraining FX "from continuing to infringe [her] right of publicity." To assist our analysis, we separate de Havilland's legal theories and address each one separately.

27

seems to ground this claim in four scenes or lines in *Feud*: (1) a fictionalized interview at the 1978 Academy Awards; (2) a reference by the de Havilland character to her "bitch sister" in a private conversation with the Bette Davis character; (3) a remark to the Aldrich character that she "do[esn't] do bitches" and he should "call [her] sister" about a film role; and (4) a response to the Davis character's question ("where's the booze?") when the two are alone in Frank Sinatra's dressing room that "Frank must've drunk it all."

  b. *False light invasion of privacy and de Havilland's required showing*

  " 'False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.' " (*Jackson, supra*, 10 Cal.App.5th at p. 1264.) " 'A "false light" claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such.' " (*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 678 (*Brodeur*).) "In order to be actionable, the false light in which the plaintiff is placed must be highly offensive to a reasonable person." (*Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 238 (*Fellows*), citing Rest.2d Torts § 652E, p. 394.) " 'A "false light" cause of action is in substance equivalent to a libel claim, and should meet the same requirements of the libel claim, including proof of malice.' " (*Brodeur,* at p. 678, quoting *Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146,161 (*Aisenson*).)

To defeat FX's anti-SLAPP motion on her false light claim, de Havilland, as a public figure, must demonstrate a reasonable probability she can prove FX broadcast statements that are (1) assertions of fact, (2) actually false or create a false impression about her, (3) highly offensive to a reasonable person or defamatory, and (4) made with actual malice. (*Brodeur*, *supra*, 248 Cal.App.4th at p. 678; see also *Dodds v. American Broadcasting Co.* (9th Cir. 1998) 145 F.3d 1053 (*Dodds*); cf. *Fellows, supra,* 42 Cal.3d at p. 239 ["Although it is not necessary that the plaintiff be defamed, publicity placing one in a highly offensive false light will in most cases be defamatory as well"].) We decide as a matter of law whether a reasonable viewer would interpret *Feud* as conveying (a) statements of fact that are (b) defamatory or highly offensive to a reasonable person and (c) actually false or that convey a false impression of de Havilland. (*Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1497, 1500-1501 (*Couch*) [" 'the proper focus of judicial inquiry in [defamation and false light cases] is simply whether the communication in question could be reasonably understood in a defamatory sense by those who received it' "; "[t]his question must be resolved by considering whether the reasonable or 'average' reader would so interpret the material"]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724; see also *Ollman v. Evans* (D.C. Cir. 1984) 750 F.2d 970, 978 [questions as to privileges derived from the First Amendment are to be decided as matters of law].) "The Supreme Court and other courts have emphasized that one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact." (*Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1153 (*Partington*).)

Accordingly, de Havilland must offer admissible evidence that the average, reasonable viewer of *Feud*, watching the scenes in their original context, would have understood them to convey statements of fact that she is "a hypocrite, selling gossip" and a person who "speak[s] in crude and vulgar terms about others." (*Couch, supra*, 33 Cal.App.4th at p. 1501.) She also must demonstrate that these scenes and lines in *Feud* "would be highly offensive to a reasonable person," (*Sarver, supra*, 813 F.3d 891 at p. 907) a person "of ordinary sensibilities." (*Aisenson, supra,* 220 Cal.App.3d at p. 161.) In light of the actual docudrama itself -- which we have viewed in its entirety -- de Havilland cannot meet her burden.

c. *The fictitious interview and the light-hearted reference to Frank Sinatra's drinking are neither reasonably susceptible to a defamatory meaning nor highly offensive to a reasonable person*

First, we question whether a reasonable viewer would interpret *Feud* -- a docudrama -- as entirely factual. Viewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined. (See *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 512-513 [111 S.Ct. 2419, 115 L.Ed.2d 447] (*Masson*) ["[A]n acknowledgement that the work is so-called docudrama or historical fiction . . . might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed"]; *Partington, supra,* 56 F.3d at pp. 1154-1155 ["the general tenor of the docudrama also tends to negate the impression that the statements involved represented a false assertion of objective fact"; docudramas "often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical

flourishes"; most viewers of docudramas "are aware by now that parts of such programs are more fiction than fact"].)

In any event, assuming for argument's sake that the average, reasonable viewer would see the scenes in question as literal statements of actual fact, de Havilland's false light claim fails nevertheless because *Feud*'s depiction of her is not defamatory nor would it "highly offend" a reasonable person. Granting an interview at the Academy Awards is not conduct that would subject a person to hatred, contempt, ridicule, or obloquy. (Cf. *Jackson, supra*, 10 Cal.App.5th at pp. 1264-1265 [famous boxer's social media postings that he broke up with his girlfriend because she had an abortion "did not expose [girlfriend] to 'hatred, contempt, ridicule, or obloquy' "].) *Feud*'s writers explained in their declarations that they employed the fictitious interview as a "framing device." In the interview, Zeta-Jones as de Havilland introduces the theme of powerful men misusing women in Hollywood. She says she was "furious" when she learned how Crawford and Davis had been pitted against one another. *Feud*'s producers wove this theme throughout the miniseries, culminating in the title of the final episode: "You Mean All This Time We Could Have Been Friends?" From time to time in the docudrama -- in brief segments[12] -- Zeta-Jones acts as a guide for the viewer through the tale, a Beatrice to the viewer's Dante.[13]

---

[12]     The "interview" segments consume fewer than seven minutes of the 392-minute miniseries, about 1.8 percent of the total work.

[13]     Aligheri, The Divine Comedy (1320).

Zeta-Jones plays de Havilland as a wise, witty, sometimes playful woman. That wit is the same as that displayed by the real de Havilland when she appeared in November 1973 on Merv Griffin's talk show. When Griffin asked de Havilland whether the relationship between a talented director and a talented actress was like that of husband and wife, de Havilland responded, "No. It's like lovers. It's the next best thing to sex." (On the talk show, de Havilland also told Griffin that when she and Bette Davis were both at Warner Brothers Davis "got all the interesting parts" and that Davis deserved them.) De Havilland's wit and playfulness also are evident in her book *Every Frenchman Has One*, published in 1961 and reissued in 2016 with an added "Q and A" with de Havilland. De Havilland includes an entire chapter on the habit of French men of urinating by the side of the road, in public. Taken in its entirety and in context, Zeta-Jones's portrayal of de Havilland is overwhelmingly positive. Indeed, with possible exception of Aldrich's assistant, aspiring director Pauline Jameson (played by Alison Wright), *Feud*'s portrayal of de Havilland is the most favorable of any character in the docudrama. The work itself belies de Havilland's contention that Zeta-Jones portrays de Havilland as a "vulgar gossip" and "hypocrite."

Nor is Zeta-Jones's light-hearted, offhand remark as de Havilland to her good friend Bette Davis while they are alone in Sinatra's dressing room that he must have drunk the liquor defamatory or highly offensive to a reasonable person. FX submitted evidence in support of its motion that Sinatra's fondness for alcohol was well known, and Zeta-Jones's comment to Sarandon would not subject de Havilland to hatred, contempt, ridicule, or obloquy. (*Jackson*, *supra*, 10 Cal.App.5th at

32

pp. 1264-1265; see also *Sarver, supra*, 813 F.3d at pp. 906-907 ["a reasonable viewer of the film would be left with the conclusion that the character [Sarver says is him] was a heroic figure, albeit one struggling with certain internal conflicts"; "even if the film's portrayal of Sarver were somehow false, such depiction certainly would not 'highly offend' a reasonable person"].)

d.  *The "bitch" remarks -- when de Havilland's actual words were "dragon lady" -- are not highly offensive to a reasonable person and are, in addition, substantially truthful characterizations of her actual words*

" 'California law permits the defense of substantial truth,' and thus a defendant is not liable ' "if the substance of the charge be proved true . . . ." ' 'Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the  . . . truth would have produced." ' "  (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344-345, quoting *Masson, supra,* 501 U.S. at pp. 516-517; see also *Jackson*, *supra*, 10 Cal.App.5th at p. 1262; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 28 [" ' "it is sufficient if the substance, the gist, the sting of the libelous charge be justified" ' "].)

In *Feud*, Zeta-Jones uses the word "bitch" twice.  In the fifth episode, Sarandon, as Davis, calls Zeta-Jones, as de Havilland, who is living in Paris.  The two close friends have a private telephone conversation.  Sarandon complains that Crawford "sets [her] off," and then refers to de Havilland's well-known estrangement from her sister Joan Fontaine.  Zeta-Jones tells Sarandon her "bitch sister" has started telling the press that she broke Fontaine's collarbone when they were children.  The second use of the word comes in the seventh episode when Sarandon and Alfred Molina, playing Robert Aldrich, call

33

de Havilland in Paris to ask her to replace Crawford as cousin Miriam in *Hush . . . Hush, Sweet Charlotte.* Molina tells Zeta-Jones that the role is not a victim but a "villainess." Zeta-Jones responds, "Oh, no. I don't do bitches. They make me so unhappy." She then adds, "You should call my sister."[14]

In its motion to strike, FX submitted declarations from Ryan Murphy and Timothy Minear, who both wrote parts of *Feud.* Both men were familiar with the well-publicized life-long animosity between de Havilland and her sister Joan Fontaine. Murphy wrote the scene in which Zeta-Jones uses the words "my bitch sister" on the telephone with Sarandon. Ryan declared he used the word "bitch" "because, in [his] mind, the terms *dragon lady* and *bitch* generally have the same meaning, but 'bitch' would be more recognizable to the audience than 'Dragon Lady.' " Similarly, Minear declared *Feud*'s writers "thought 'bitch' was more mainstream and would be better understood by the modern audiences than 'Dragon Lady.' "

Had *Feud*'s creators had Zeta-Jones refer to Fontaine as "my dragon lady sister," the "effect on the mind of the reader" would not have been appreciably different. Nor would a line by the de Havilland character, "Oh, no. I don't do dragon ladies. They make me so unhappy. You should call my sister."[15] "[W]e decline ' "to dissect the creative process." ' " (*Brodeur, supra,*

---

[14] De Havilland eventually accepted the role of cousin Miriam in *Hush . . . Hush.*

[15] *Feud* writer Minear notes the first part of de Havilland's telephone conversation with Aldrich was reported in Shaun Considine's book, *Bette & Joan: The Divine Feud*, first published in 1989 and reissued twice since.

248 Cal.App.4th at p. 677, quoting *Tamkin, supra,* 193 Cal.App.4th at p. 144.)  " ' "We must not permit juries to dissect the creative process in order to determine what was *necessary* to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity is, by its nature, creative." ' " (*Brodeur* at p. 675, quoting *Tamkin, supra,* 193 Cal.App.4th at pp. 144-145.)

> e. *De Havilland has not demonstrated she can prove by clear and convincing evidence that* Feud's *creators acted with actual malice*

De Havilland does not dispute that she is a public figure. Her attorneys describe her as "a living legend" and "an internationally-known celebrity."  Accordingly, the Constitution requires de Havilland to prove by clear and convincing evidence that FX "knew the [docudrama] would create a false impression about [her] or acted with reckless disregard for the truth."  (CACI No. 1802.)

When the expressive work at issue is fiction, or a combination of fact and fiction, the "actual malice" analysis takes on a further wrinkle.  De Havilland argues that, because she did not grant an interview at the 1978 Academy Awards or make the "bitch sister" or "Sinatra drank the alcohol" remarks to Bette Davis, *Feud*'s creators acted with actual malice.  But fiction is by definition untrue.  It is imagined, made-up.  Put more starkly, it is false.  Publishing a fictitious work about a real person cannot mean the author, by virtue of writing fiction, has acted with actual malice.

Recognizing this, in cases where the claimed highly offensive or defamatory aspect of the portrayal is implied, courts have required plaintiffs to show that the defendant " 'intended to

35

convey the defamatory impression.' " (*Dodds, supra*, 145 F.3d at pp. 1063-1064.) De Havilland must demonstrate "that [FX] either deliberately cast [her] statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that [it] knew or acted in reckless disregard of whether [its] words would be interpreted by the average reader as defamatory statements of fact." (*Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 684 (*Good Government Group*).) Moreover, because actual malice is a "deliberately subjective" test, liability cannot be imposed for an implication that merely " 'should have been foreseen.' " (*Newton v. National Broadcasting Co., Inc.* (9th Cir. 1990) 930 F.2d 662, 680.)

As discussed above, we conclude Zeta-Jones's portrayal of de Havilland in *Feud* is not highly offensive to a reasonable person as a matter of law. Even if it were, however, de Havilland has not demonstrated that she can prove actual malice by clear and convincing evidence. In his sworn declaration, Murphy stated he intended Zeta-Jones's portrayal of de Havilland to be that of "a wise, respectful friend and counselor to Bette Davis, and a Hollywood icon with a unique perspective on the past."

5. *De Havilland's cause of action for unjust enrichment cannot proceed*

De Havilland's fourth cause of action, entitled "Unjust Enrichment," alleges FX has "received unjust financial and economic benefits at [her] expense," including "the value of the use of [her] name, image[,] and identity for [FX's] commercial purposes." De Havilland asks for FX's "gross revenues" and a constructive trust.

"Unjust enrichment is not a cause of action." It is "just a restitution claim." (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1307.) Because de Havilland's right of publicity and false light claims fail, her unjust enrichment claim fails as well. "There being no actionable wrong, there is no basis for the relief." (*Ibid.*)

## CONCLUSION

The trial court's ruling leaves authors, filmmakers, playwrights, and television producers in a Catch-22.[16] If they portray a real person in an expressive work accurately and realistically without paying that person, they face a right of publicity lawsuit. If they portray a real person in an expressive work in a fanciful, imaginative -- even fictitious and therefore "false" -- way, they face a false light lawsuit if the person portrayed does not like the portrayal. "[T]he right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals." (*Comedy III*, *supra*, 25 Cal.4th at p. 403.) FX's evidence here -- especially the docudrama itself -- establishes as a matter of law that de Havilland cannot prevail. (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1346.) " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable.' " (*Winter*, *supra*, 30 Cal.4th at p. 891, quoting *Good Government Group, supra*, 22 Cal.3d at p. 685.)

---

16      Heller, Catch-22 (1961).

37

## DISPOSITION

The order denying the motion to strike is reversed.  The trial court is directed to enter a new and different order granting the motion and awarding defendants their attorney fees and costs.  (Code Civ. Proc., § 425.16, subd. (c).)  Defendants shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**

EGERTON, J.

We concur:

EDMON, P. J.

DHANIDINA, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.